# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
### WESTERN DIVISION

JOHN HOLLAND,
    Plaintiff

    vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

Case No. 1:09-cv-240
Weber, J.
Hogan, M.J.

**REPORT AND
RECOMMENDATION**

Plaintiff brings this action pursuant to 42 U.S.C. § 405(g) for judicial review of the final

decision of the Commissioner of Social Security (Commissioner) denying plaintiff's application

for Supplemental Security Income (SSI). This matter is before the Court on plaintiff's Statement

of Errors (Doc. 5), the Commissioner's response in opposition (Doc. 8), and plaintiff's reply

memorandum. (Doc. 11).

## PROCEDURAL BACKGROUND

Plaintiff John Holland was born in 1958 and was 49 years old at the time of the

Administrative Law Judge hearing. He has a ninth grade education and no past relevant work

history. (Tr. 30). Plaintiff filed an SSI application on October 30, 2004 alleging an onset date of

disability of July 14, 2004, due to back problems, Hepatitis C, fibrosis of the liver, gerd, ulcers,

erosion of the esophagus, anxiety disorder, depression, and bi-polar disorder. (Tr. 104).

Plaintiff's application was denied initially and upon reconsideration. Plaintiff then requested and

was granted a de novo hearing before an administrative law judge (ALJ). Plaintiff, who was

represented by counsel, appeared at a hearing before ALJ Thomas McNichols. A vocational

expert (VE) also appeared and testified at the hearing.

On March 18, 2008, the ALJ issued a decision denying plaintiff's SSI application. The ALJ determined that plaintiff suffers from the following severe impairments: vertebrogenic disorders of the cervical and lumber spines with residual effects of surgeries, hepatitis C, and bipolar disorder with depression and anxiety. (Tr. 20). The ALJ found that such impairments do not meet or equal the level of severity described in the Listing of Impairments. (Tr. 24). The ALJ determined that plaintiff's subjective allegations lack credibility. (Tr. 29). According to the ALJ, plaintiff retains the residual functional capacity (RFC) to perform a reduced range of light work activities with the following limitations: 1) alternate sitting and standing at thirty minute intervals ; 2) no repetitive stooping, twisting at the waist, or crouching; 3) no kneeling or crawling; 4) no repetitive work above shoulder level on the right side; 5) no exposure to vibrations; 6) no climbing of ropes, ladders, or scaffolds; 7) no exposure to hazards; 8) no exposure to temperature extremes or humidity; 9) low stress jobs with no production quotas; 10) no complex or detailed instructions; and 11) no requirements to maintain concentration on a single task for longer then fifteen minutes at a time. (Tr. 26-27). The ALJ determined that plaintiff has no past relevant work. (Tr. 29). Based on the vocational expert's testimony, the ALJ determined that plaintiff could perform other jobs that exist in significant numbers in the national economy. (Tr. 30). Consequently, the ALJ concluded that plaintiff is not disabled under the Act and therefore not entitled to disability benefits. The Appeals Council denied plaintiff's request for review making the decision of the ALJ the final administrative decision of the Commissioner.

## APPLICABLE LAW

The following principles of law control resolution of the issues raised in this case.

2

Judicial review of the Commissioner's determination is limited in scope by 42 U.S.C. § 405(g). The Court's sole function is to determine whether the record as a whole contains substantial evidence to support the Commissioner's decision. The Commissioner's findings stand if they are supported by "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971) (citing *Consolidated Edison Co. v. N.L.R.B.*, 305 U.S. 197, 229 (1938)). In deciding whether the Commissioner's findings are supported by substantial evidence, the Court must consider the record as a whole. *Hephner v. Mathews*, 574 F.2d 359 (6th Cir. 1978).

To qualify for SSI benefits, plaintiff must file an application and be an "eligible individual" as defined in the Act. 42 U.S.C. § 1382(a); 20 C.F.R. § 416.202. Eligibility is dependent upon disability, income, and other financial resources. 20 C.F.R. § 416.202. To establish disability, plaintiff must demonstrate a medically determinable physical or mental impairment that can be expected to last for a continuous period of not less than twelve months. Plaintiff must also show that the impairment precludes performance of the work previously done, or any other kind of substantial gainful employment that exists in the national economy. 20 C.F.R. § 416.905.

Regulations promulgated by the Commissioner establish a sequential evaluation process for disability determinations. 20 C.F.R. § 404.1520. First, the Commissioner determines whether the individual is currently engaging in substantial gainful activity; if so, a finding of nondisability is made and the inquiry ends. Second, if the individual is not currently engaged in substantial gainful activity, the Commissioner must determine whether the individual has a severe impairment or combination of impairments; if not, then a finding of nondisability is made and the

3

inquiry ends. Third, if the individual has a severe impairment, the Commissioner must compare it to those in the Listing of Impairments, 20 C.F.R. Part 404, Subpart P, Appendix 1. If the impairment meets or equals any within the Listing, disability is presumed and benefits are awarded. 20 C.F.R. § 404.1520(d). Fourth, if the individual's impairments do not meet or equal those in the Listing, the Commissioner must determine whether the impairments prevent the performance of the individual's regular previous employment. If the individual is unable to perform the relevant past work, then a prima facie case of disability is established and the burden of going forward with the evidence shifts to the Commissioner to show that there is work in the national economy which the individual can perform. *Lashley v. Secretary of H.H.S.*, 708 F.2d 1048 (6th Cir. 1983); *Kirk v. Secretary of H.H.S.*, 667 F.2d 524 (6th Cir. 1981), *cert. denied*, 461 U.S. 957 (1983).

Plaintiff has the burden of establishing disability by a preponderance of the evidence. *Born v. Secretary of Health and Human Servs.*, 923 F.2d 1168, 1173 (6th Cir. 1990); *Bloch v. Richardson*, 438 F.2d 1181 (6th Cir. 1971). Once plaintiff establishes a prima facie case by showing an inability to perform the relevant previous employment, the burden shifts to the Commissioner to show that plaintiff can perform other substantial gainful employment and that such employment exists in the national economy. *Harmon v. Apfel*, 168 F.3d 289, 291 (6th Cir. 1999); *Born*, 923 F.2d at 1173; *Allen v. Califano*, 613 F.2d 139 (6th Cir. 1980). To rebut a prima facie case, the Commissioner must come forward with particularized proof of plaintiff's individual capacity to perform alternate work considering plaintiff's age, education, and background, as well as the job requirements. *O'Banner v. Secretary of H.E.W.*, 587 F.2d 321, 323 (6th Cir. 1978). *See also Richardson v. Secretary of Health & Human Services*, 735 F.2d

4

962, 964 (6th Cir. 1984) (per curiam). Alternatively, in certain instances the Commissioner is entitled to rely on the medical-vocational guidelines (the "grid") to rebut plaintiff's prima facie case of disability. 20 C.F.R. Subpart P, Appendix 2; *O'Banner*, 587 F.2d at 323. *See also Cole v. Secretary of Health and Human Services*, 820 F.2d 768, 771 (6th Cir. 1987).

Pain alone, if the result of a medical impairment, may be severe enough to constitute disability. *Kirk v. Secretary of H.H.S.*, 667 F.2d 524, 538 (6th Cir. 1981), *cert. denied,* 461 U.S. 957 (1983). In order to find plaintiff disabled on the basis of pain alone, the Commissioner must first determine whether there is objective medical evidence of an underlying medical condition. If there is, the Commissioner must then determine: (1) whether the objective medical evidence confirms the severity of pain alleged by plaintiff; or (2) whether the underlying medical impairment is severe enough that it can reasonably be expected to produce the allegedly disabling pain. *Duncan v. Secretary of H.H.S.*, 801 F.2d 847, 852-53 (6th Cir. 1986). *See also Felisky v. Bowen*, 35 F.3d 1027, 1038-39 (6th Cir. 1994); *Jones v. Secretary of H.H.S.*, 945 F.2d 1365, 1369 (6th Cir. 1991). This test, however, "does not require . . . 'objective evidence of the pain itself.'" *Duncan*, 801 F.2d at 853. Where a complaint of pain is not fully supported by objective medical findings, the Commissioner should consider the frequency and duration of pain, as well as other precipitating factors including the effect of the pain upon plaintiff's activities, the effect of plaintiff's medications and other treatments for pain, and the recorded observations of pain by plaintiff's physicians. *Felisky*, 35 F.3d at 1039-40.

Where the medical evidence is consistent, and supports plaintiff's complaints of the existence and severity of pain, the ALJ may not discredit plaintiff's testimony and deny benefits. *King v. Heckler*, 742 F.2d 968, 975 (6th Cir. 1984). Where, however, the medical evidence

5

conflicts, and there is substantial evidence supporting and opposing a finding of disability, the Commissioner's resolution of the conflict will not be disturbed by the Court. *Kinsella v. Schweiker*, 708 F.2d 1058, 1059 (6th Cir. 1983) (per curiam). In either event, the ALJ must articulate, on the record, his evaluation of the evidence and how it relates to the factors listed above. *Felisky*, 35 F.3d at 1039-41.

It is well established that the findings and opinions of treating physicians are entitled to substantial weight. "In general, the opinions of treating physicians are accorded greater weight than those of physicians who examine claimants only once." *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 530-31 (6th Cir. 1997). *See also Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985) ("The medical opinions and diagnoses of treating physicians are generally accorded substantial deference, and if the opinions are uncontradicted, complete deference."); *King v. Heckler*, 742 F.2d 968, 973 (6th Cir. 1984) (same); *Lashley v. Secretary of HHS*, 708 F.2d 1048, 1054 (6th Cir. 1983) (same). Likewise, a treating physician's opinion is entitled to weight substantially greater than that of a non-examining medical advisor. *Harris v. Heckler*, 756 F.2d 431, 435 (6th Cir. 1985); *Lashley v. Secretary of H.H.S.,* 708 F.2d 1048, 1054 (6th Cir. 1983). If a treating physician's "opinion on the issue(s) of the nature and severity of [a claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case," the opinion is entitled to controlling weight. 20 C.F.R. § 1527(d)(2); *see also Blakely v. Commissioner*, 581 F.3d 399, 406 (6th Cir. 2009); *Wilson v. Commissioner*, 378 F.3d 541, 544 (6th Cir. 2004)*; Walters*, 127 F.3d at 530. "The treating physician doctrine is based on the assumption that a medical professional who has dealt with a claimant and his maladies over a long period of time will have a deeper

6

insight into the medical condition of the claimant than will a person who has examined a claimant but once, or who has only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994).

The Social Security regulations likewise recognize the importance of longevity of treatment, providing that treating physicians "are likely to be the medical professionals most able to provide a detailed, longitudinal picture of your medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations." 20 C.F.R. § 404.1527(d)(2). In weighing the various opinions and medical evidence, the ALJ must consider other pertinent factors such as the length, nature and extent of the treatment relationship, the frequency of examination, the medical specialty of the treating physician, the opinion's supportability by evidence and its consistency with the record as a whole. 20 C.F.R. § 404.1527(d)(2)-(6); *Wilson*, 378 F.3d at 544. In terms of a physician's area of specialization, the ALJ must generally give "more weight to the opinion of a specialist about medical issues related to his or her area of specialty than to the opinion of a source who is not a specialist." 20 C.F.R. § 404.1527(d)(5).

If the Commissioner's decision is not supported by substantial evidence, the Court must decide whether to reverse and remand the matter for rehearing or to reverse and order benefits granted. The Court has authority to affirm, modify, or reverse the Commissioner's decision "with or without remanding the cause for rehearing." 42 U.S.C. § 405(g); *Melkonyan v. Sullivan*, 111 S. Ct. 2157, 2163 (1991).

Where the Commissioner has erroneously determined that an individual is not disabled at

7

steps one through four of the sequential evaluation, remand is often appropriate so that the sequential evaluation may be continued. *DeGrande v. Secretary of H.H.S.*, 892 F.2d 1043 (6th Cir. 1990) (unpublished), 1990 WL 94. Remand is also appropriate if the Commissioner applied an erroneous principle of law, failed to consider certain evidence, failed to consider the combined effect of impairments, or failed to make a credibility finding. *Faucher v. Secretary of H.H.S.*, 17 F.3d 171, 176 (6th Cir. 1994). Remand ordered after a hearing on the merits and in connection with an entry of judgment does not require a finding that the Commissioner had good cause for failure to present evidence at the prior administrative hearing. *Faucher*, 17 F.3d at 173.

Benefits may be immediately awarded "only if all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Faucher,* 17 F.3d at 176. *See also Abbott v. Sullivan*, 905 F.2d 918, 927 (6th Cir. 1990); *Varley v. Secretary of Health and Human Services*, 820 F.2d 777, 782 (6th Cir. 1987). The Court may award benefits where the proof of disability is strong and opposing evidence is lacking in substance, so that remand would merely involve the presentation of cumulative evidence, or where the proof of disability is overwhelming. *Faucher*, 17 F.3d at 176. *See also Felisky v. Bowen*, 35 F.3d 1027, 1041 (6th Cir. 1994); *Mowery v. Heckler*, 771 F.2d 966, 973 (6th Cir. 1985).

## MEDICAL EVIDENCE

### Physical Impairments

Plaintiff has received treatment from various physicians at the Middletown Regional Hospital for many years. On July 14, 2004, David Magnusen, M.D., reviewed plaintiff's medical history: Plaintiff was diagnosed with lumbar degenerative disc disease and underwent a cage fusion at L5-S1 in 1998 following an auto accident. (Tr. 465). He continued to experience

8

persistent pain following the surgery and x-rays failed to show definite bone healing. In March 2000, plaintiff underwent a pedicle screw fixation at L5-S1 followed by physical therapy. Plaintiff fell in September 2002, and has "suffered severe lower back pain ever since." (Tr. 465). Examination at the University of Cincinnati's Mayfield Clinic in February and November 2002 showed no evidence of neurologic compromise and x-rays showed a solid fusion. An October 2002 electrodiagnostic exam showed mild peripheral neuropathy, but no evidence of lumbosacral radiculopathy. In November 2003, plaintiff's spinal hardware was surgically removed. Dr. Magnusen noted that plaintiff continued to complain of persistent back and lower right limb pain "necessitating several trips to the emergency room for additional pain medication." (Tr. 465).

On the date of examination on July 14, 2004, plaintiff complained of mild leg weakness and chronic back pain aggravated by prolonged walking, standing or lifting. (Tr. 465). On physical examination, plaintiff did not appear to be in significant distress. (Tr. 466). Plaintiff occasionally ambulated with a cane, although Dr. Magnusen saw the cane as "nonobligatory." (Tr. 466). Dr. Magnusen saw no evidence of instability with plaintiff's stance or gait. (Tr. 466). Plaintiff demonstrated that he could get on and off the examining table without difficulty. (Tr. 466). Dr. Magnusen noted plaintiff had "a heightened sensitivity to pain" and suggested a trial of a topical Lidoderm patch. (Tr. 466-67).

Two weeks later, plaintiff presented to the emergency room with an acute exacerbation of back pain, stating he "has been unable to see his physician recently." (Tr. 461-62). Ralph Talkers, M.D., prescribed a narcotic pain medication "despite reluctance" and urged plaintiff to follow-up with his physician and not to return to the emergency room for a refill of pain medication. (Tr. 463).

9

On August 29, 2004, plaintiff again presented to the emergency room. Dr. Talkers described plaintiff as an alert male, sitting comfortably, who had his cane with him. (Tr. 453). Bilateral straight leg raising tests produced normal results. (Tr. 453). Plaintiff demonstrated a full range of motion in his extremities. (Tr. 453). Dr. Talkers opined that plaintiff's presenting symptoms were most consistent with an acute exacerbation of low back pain after working on his car. (Tr. 453). Dr. Talkers stated that he would provide plaintiff with a short-term course of narcotic medication for his acute pain with encouragement to followup with Dr. Kaiser for pain management. (Tr. 453).

An August 2004 CT scan revealed no evidence of vertebral compression or disc space narrowing, no evidence of disc herniation, spinal canal stenosis, or foraminal narrowing, and facet arthropathy at L3 through S1 levels. (Tr. 456). A lumbar x-ray showed inter-discal cage at L5-S1 with facet arthropathy, intact disc space heights at the remaining levels, no fractures or dislocations, and no focal bony abnormalities. (Tr. 459).

An emergency room note dated September 5, 2004, stated plaintiff presented with back pain seeking a refill of Darvocet. (Tr. 448). On examination, plaintiff "had a very exaggerated complaint of pain on palpation of his back." *Id.* He was given a short course of Percocet and advised to follow-up with his doctor. *Id.* On September 8, 2004, plaintiff was again given a prescription for Percocet. (Tr. 445). On September 26, 2004, he received another refill on his medications. (Tr. 440).

Plaintiff was seen at the Middletown Community Health Center in October and December 2004 for hypertension, chronic back pain, GERD. (Tr. 616-17). He was prescribed Vicodin for the back pain. (Tr. 616).

On October 21, 2004, plaintiff saw Lee A. Dudley, D.O., for throat and esophagus pain. (Tr. 437-38). Dr. Dudley noted midline tenderness in the cervical, thoracic, and lumbar areas as well as the lumbosacral joints with no appreciated muscle spasm. (Tr. 438). Straight leg raising was negative with the remainder of the examination unremarkable. *Id.* He diagnosed gastroesophageal reflux and chronic back pain. (Tr. 438). Plaintiff stated that there really had been no change in his back pain. (Tr. 438). Dr. Dudley provided the medication that plaintiff requested, a gastro-intestinal (GI) cocktail that, according to plaintiff, helped resolve his stomach and esophageal discomfort. (Tr. 438).

On January 29, 2005, plaintiff presented to the emergency department complaining of back pain and seeking a refill of Vicodin. (Tr. 430). The emergency room doctor noted that plaintiff was a patient with "multiple presentations to the emergency department for pain medications." (Tr. 430). The doctor "spoke with the patient at length, indicating [he] did not feel that continued Vicodin or Percocet prescriptions were appropriate" and that he should follow-up with his personal physician for management of his pain. *Id.*

On May 18, 2005, plaintiff entered the emergency room complaining of abdominal pain. (Tr. 369). Tao Nguyen, M.D., described plaintiff as resting comfortably in the exam room and noted that plaintiff was "very interactive" and did not appear to be in any acute distress. (Tr. 370). Dr. Nguyen prescribed Phenergan and Norgesic Forte and instructed plaintiff to follow-up with his primary care physician in one to two days. (Tr. 371).

On June 17, 2005, plaintiff presented with abdominal pain and requested a refill of Vicodin. Dr. Talkers reported, "I will politely oblige him to a short course of Vicodin with emphasis on outpatient follow up for further medication management and refills." (Tr. 425).

11

The following week, plaintiff was seen in the emergency department complaining of insomnia. (Tr. 408-10). He was prescribed Ambien and discharged. *Id.* Plaintiff was again seen in July 2005 for insomnia and prescribed Ambien. (Tr. 413-14).

Between January and September 2005, plaintiff was seen at the Middletown Community Health Center seven times for follow up appointments for his Hepatitis C, back pain, GERD, hypertension, and psoriasis, and for medication refills. (Tr. 605-615).

In 2006, plaintiff was seen eleven times by doctors at the Butler County Community Health Consortium for Hepatitis C, back pain, GERD, hypertension, psoriasis, IBS, constipation, nausea, and bradycardia, and for refills on his medications. (Tr. 604-579). The progress notes indicate plaintiff was being followed by Dr. Min, his gastroenterologist, for Hepatitis C. In late 2006, plaintiff was prescribed methocarbamol for back pain. (Tr. 581-83).

A July 2006 CT scan of the abdomen and pelvis revealed no acute findings. (Tr. 530).

On August 16, 2006, plaintiff underwent esophagogastroduodenoscopy with biopsy after indications of elevated liver enzymes, constipation, and dyspepsia. (Tr. 562). The procedure revealed esophagitis, a hiatal hernia, and gastritis. (Tr. 562). The core biopsy of the liver showed chronic hepatitis C with mild activity and mild periportal fibrosis. (Tr. 550, 554). Dr. Min, plaintiff's gastroenterologist, reported impressions of IBS (constipation predominant type) and chronic HVC with "cirrhosis." (Tr. 550).

A December 2006 lumbar spine x-ray showed normal alignment of the lumbar vertebrae, post-surgical changes related to interbody fusion at L5-S1, and no acute findings. (Tr. 555).

On January 5, 2007, plaintiff saw Aleda Johnson, M.D., at the Butler County Community Health Consortium and requested hepatitis A and B immunizations. (Tr. 577).

12

On January 21, 2007, Dennis Mann, M.D., stated that plaintiff presented with back pain "similar to multiple previous episodes." (Tr. 719). On examination, Dr. Mann found some bilateral paralumbar tenderness. (Tr. 719). Dr. Mann described good range of motion in the upper and lower extremities. (Tr. 720). Dr. Mann diagnosed acute exacerbation of lumbar strain with a long history of degenerative disc disease. (Tr. 720).

On February 5, 2007, plaintiff returned to the emergency department and was seen by William Cole, M.D., for nausea and abdominal pain, and because he had run out of the medication Phenergan. (Tr. 721). Dr. Cole ran a complete metabolic panel and found that plaintiff was stable. (Tr. 722). Dr. Cole treated plaintiff with intramuscular (IM) Phenergan and plaintiff stated that this made him feel "a lot" better." (Tr. 722). Dr. Cole referred plaintiff back to Dr. Min. (Tr. 722). A subsequent esophagogastroduodenoscopy with biopsy revealed mild chronic gastroesophagitis. (Tr. 723, 725).

On March 2, 2007, plaintiff saw Shazia Khan, M.D., at the Butler County Community Health Consortium (BCCHC) for a refill of his medications. (Tr. 575). The assessment was psoriasis, Hepatitis C, and psychiatric problems. (Tr. 575). He was to return to the office in two to three months for a follow-up. *Id.*

On March 13, 2007, Shazia Khan, M.D., filled out a "Physical Residual Functional Capacity Questionnaire" for plaintiff. (Tr. 624-28). When asked to identify the frequency of contact with plaintiff, Dr. Kahn wrote that plaintiff had been coming to the BCCHC since 2004. (Tr. 624). Dr. Khan diagnosed Hepatitis C, back pain, psychiatric problems, and Chron's Disease. Dr. Khan noted that emotional factors contribute to the severity of plaintiff's symptoms and functional limitations. (Tr. 624). Dr. Kahn estimated that plaintiff could walk only one block

13

before experiencing pain. (Tr. 625). Dr. Kahn limited standing/walking to less than two hours and sitting to about four hours in an eight-hour day. (Tr. 625). Plaintiff would also need unscheduled breaks throughout the day and Dr Khan opined that these breaks would include a "couple of hours" of rest. (Tr. 626). Dr. Khan noted that plaintiff's experience of pain constantly interfered with attention and concentration and that plaintiff had a marked limitation in his ability to deal with work stress. (Tr. 625). Dr. Khan also estimated that plaintiff would miss work about three times each month. (Tr. 627). Finally, Dr. Khan stated plaintiff was to never crawl, balance or stoop, and must avoid moving machinery. (Tr. 628).

On July 17, 2007, plaintiff saw Dr. Talkers and complained of back and side pain, as well as bilateral leg pain from Interferon injections. (Tr. 732). Dr. Talkers assessed musculoskeletal pain in plaintiff's posterior chest and back. (Tr. 733). Dr. Talkers prescribed Percocet and discharged plaintiff to follow up with Dr. Khan. (Tr. 733).

Plaintiff underwent a colonoscopy in August of 2007 due to abdominal pain, GI bleed and diarrhea. The colonoscopy revealed hemorrhoids. (Tr. 734).

X-rays in September and October 2007 showed a long-standing fusion of C2 and C3 and postoperative changes in the lumbosacral junction with no evidence of acute abnormality. (Tr. 744, 746).

Plaintiff saw Dasen Ritchey, M.D., in September and October 2007 for abdominal pain with constipation and nausea. (Tr. 758-759). Dr. Ritchey recommended plaintiff increase his fiber and liquid intake and noted there was no specific surgical problem. (Tr. 759). Dr. Ritchey believed that the pain was either musculoskeletal in nature or probably related to multiple level of homosacral disease. (Tr. 758).

14

On September 21, 2007, plaintiff was seen by Dina Ezzeddine, M.D. (Tr. 768). Dr. Ezzeddine noted that plaintiff was currently being followed by Dr. Min for his Hepatitis C, and that he had started Interferon treatment a few months ago. (Tr. 768). This note also stated that plaintiff was trying to obtain disability benefits, but that Dr. Min apparently felt that plaintiff did not qualify so plaintiff stopped seeing Dr. Min and had come to Dr. Ezzeddine for a second opinion on the question of disability. (Tr. 767-68). Dr. Ezzeddine also noted that plaintiff did not wish to be treated by her. (Tr. 768). On the basis of this visit, Dr. Ezzeddine opined that plaintiff "is definitely not able to work, especially while he is under treatment. I think his psychiatric disease is sufficient enough for him to be on disability. Add to that the chronic pain." (Tr. 767).

Plaintiff had a liver biopsy in October of 2007 that revealed mild chronic hepatitis with periportal fibrosis. (Tr. 763). That same month, he was seen at the Butler County Community Health Consortium for chronic neck pain, hypertension, and psoriasis. He was encouraged to find a pain doctor before his symptoms get worse, but he refused. (Tr. 853-54).

On November 7, 2007, plaintiff came to the ER complaining of back and neck pain and needing a refill of his pain medications. (Tr. 770). Dr. Ashraf diagnosed chronic neck and back pain, prescribed Flexeril and Vicoprofen, and advised plaintiff to follow up with Dr. Khan. (Tr. 771). Plaintiff was back in the ER nine days later for a refill on his pain medication. (Tr. 774). He was prescribed Vicodin. *Id.*

On November 7, 2007, Dr. Ezzeddine completed a "Physical Residual Functional Capacity Questionnaire." (Tr. 714-18). Dr. Ezzeddine diagnosed chronic Hepatitis C, bipolar, depression, chronic back pain, psoriasis, hypertension, and cirrhosis. Dr. Ezzeddine reported plaintiff's prognosis was poor and that he had severe back pain, depression, and fatigue. (Tr.

15

714). She also noted that interferon for the Hepatitis C caused worsening psoriasis. She stated that plaintiff's pain was severe enough to constantly interfere with attention and concentrations and that he was incapable of even low stress jobs. Dr. Ezzeddine reported the plaintiff suffered from fatigue from advanced chronic Hepatitis C. (Tr. 715). Dr. Ezzeddine gave plaintiff the following limitations: walking less than a block, sitting for thirty minutes, and standing for fifteen minutes, and sitting/standing/walking for less than two hours in a total 8 hour workday. She also opined that plaintiff will need a job that allows periods of walking every fifteen minutes for five minutes at a time, shifting positions at will, and the ability to take unscheduled breaks every hour for fifteen minutes at a time. (Tr. 716). Dr. Ezzeddine noted the plaintiff must use a cane. She also stated plaintiff could only lift/carry ten pounds, and could never climb stairs or ladders, and rarely look down or up, stoop, and crouch. (Tr. 717). Dr. Ezzeddine reported that the plaintiff had significant limitations with handling and fingering. Finally, Dr. Ezzeddine opined that plaintiff's condition produced good/bad days and that he would be absent from work more than four days per month. (Tr. 718).

In November of 2007, Dr. K. Malloy prescribed a straight cane for plaintiff due to degenerative disc disease. (Tr. 849).

In December of 2007, plaintiff complained of swelling feet and was diagnosed the peripheral edema and lumbar pain. (Tr. 846).

In December 2007, plaintiff was referred to Howard Seitzman, M.D., for a pain medical consultation. (Tr. 835). Dr. Seitzman's impression was cervical and lumbar postlaminectomy syndrome. *Id*. Dr. Seitzman ordered an MRI of the cervical and lumbar spines. *Id*. The cervical spine MRI revealed no significant abnormalities. (Tr. 834). The MRI of the lumbar spine, done

16

on January 3, 2008, revealed mild abnormal enhancing soft tissue within the neural foramen at the L4-L5 level that was impinging on the left L4 nerve root and was suspicious for scar tissue. (Tr. 832).

Plaintiff underwent a lumbar transforaminal injection on January 16, 2008 (Tr. 830), and a cervical epidural steroid injection on January 29, 2008. (Tr. 828). Butler County health records from January 2008 note intestinal problems and constipation. (Tr. 845). In February of 2008, the records note plaintiff was seen for nausea from Hepatitis C and a wart on his foot. (Tr. 844).

## Mental Impairments

On May 25, 2005, plaintiff saw Carla S. Dreyer, Psy.D., for a consultative mental examination. (Tr. 374-80). Dr. Dreyer observed that plaintiff was able to manage his household tasks and live independently. (Tr. 379). She rated his Global Assessment of Functioning (GAF) at 65 (indicative of some mild symptoms, but also of someone who is generally functioning pretty well). (Tr. 379). She diagnosed polysubstance dependence, reportedly in remission, R/O Somatoform Disorder NOS, R/O Anxiety Disorder NOS, and Personality Disorder NOS with antisocial traits. (Tr. 379). Dr. Dreyer opined that plaintiff's mental ability to relate to others, including fellow co-workers and supervisors, was moderately impaired; his ability to understand, remember, and follow simple instructions was mildly impaired; his ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks was mildly to moderately impaired; and his ability to withstand the stress and pressures associated with day-to-day work activities was mildly to moderately impaired. (Tr. 379-80). Dr. Dreyer opined that plaintiff appeared to have the mental abilities to manage any finances granted to him, but given his history of polysubstance dependence, she recommended he

17

be assigned a payee if granted benefits. (Tr. 380).

Since October 27, 2003, plaintiff has treated with psychiatrist Gerald Shubs, M.D., at the Butler Behavioral Health Service. (Tr. 677-718, 786-790).

On July 1, 2004, Dr. Shubs completed a functional capacity assessment and opined that plaintiff was extremely limited in his ability to maintain attention and concentration for extended periods and markedly limited in his ability to accept instructions and criticism from supervisors. (Tr. 348). Dr. Shubs also opined that plaintiff was moderately limited in his ability to understand and remember detailed instructions and to carry out detailed instructions, but not otherwise limited in his ability to function from a mental standpoint. (Tr. 348). Dr. Shubs reported that plaintiff's orthopedic problems cause chronic pain, which increases his anxiety, distractibility, and difficulty concentrating. (Tr. 349). Dr. Shubs also stated that plaintiff has difficulty understanding and processing complex information. (Tr. 349).

On January 28, 2008, Dr. Shubs completed a Mental Impairment Questionnaire for plaintiff. (Tr. 780- 85). Dr. Shubs reported that he saw plaintiff every three months for one-half hour. (Tr. 780). Dr. Shubs diagnosed Bipolar Disorder, Depression, Generalized Anxiety Disorder, Agoraphobia, Chronic Pain, Poor Stress Tolerance, Alcohol Dependence in Remission, Polysubstance in Remission, and a GAF of 55. (Tr. 780). Dr. Shubs reported that plaintiff suffers from the following signs and symptoms: appetite disturbance with weight change, thoughts of suicide, impairment in impulse control, generalized persistent anxiety, mood disturbance, difficulty thinking or concentrating, psychomotor retardation, persistent disturbances of mood, apprehensive expectation, paranoid thinking, bipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes, persistent

18

irrational fear of a specific situation which results in a compelling desire to avoid the dreaded situation, delusions, hyperactivity, motor tension, emotional liability, flight of ideas, manic syndrome, vigilance and scanning, pressures of speech, easy distractibility, memory impairment, sleep disturbance, decreased need for sleep, and recurrent severe panic attacks, fear, and terror. (Tr. 781).

Dr. Shubs opined that plaintiff had no useful mental ability to function in an unskilled work setting in the following areas: work with others without being unduly distracted; complete a workday/workweek with interruptions from psychologically based symptoms; performing at a consistent pace without unreasonable rest breaks; and deal with normal work stress. (Tr. 782). Dr. Shubs also reported that plaintiff could not perform the following activities independently, appropriately, and on a sustained basis in a regular work setting: maintain regular attendance and be punctual within usual tolerances; sustain an ordinary routine without special supervision; and get along with co-workers or peers without unduly distracting them. (Tr. 782). Dr. Shubs opined that plaintiff was seriously limited in his ability to maintain attention for a two hour segment and accept instruction or criticism from supervisors. (Tr. 782). Dr. Shubs reported that plaintiff's anxiety and poor stress tolerance magnified his experience of pain. Plaintiff was markedly limited in maintaining concentrating, persistence or pace. (Tr. 783). Dr. Shubs believed that plaintiff would be absent from work more than four days per month due to his impairments and treatment. (Tr. 784). Dr. Shubs also opined that plaintiff's medications and psychotherapy have brought his symptoms under good control as long as he is not under stress. (Tr. 780). In terms of the clinical findings demonstrating the severity of plaintiff's symptoms, Dr. Shubs stated, "Currently he is tense, worried, frustrated, stressed, euthymic, grossly; his cognitive functioning

19

was normal, but he complained of stress related memory and concentration difficulty." (Tr. 780).
He rated plaintiff's prognosis as "fair." (Tr. 780).

## HEARING TESTIMONY

Plaintiff testified that he become unable to work because of neck and back pain. (Tr. 874-75). Plaintiff stated he suffers from pain, numbness in the legs, and nerve damage. (Tr. 875, 884). Plaintiff stated that Hepatitis C causes him nausea (Tr. 878) and he suffers from pain due to Crohn's. (Tr. 880). Plaintiff further testified that his most comfortable position is lying down and he suffers from insomnia. (Tr. 886). Plaintiff testified that he could only walk a block before having to rest due to back pain. (Tr. 886). He testified that he suffers from Bipolar Disorder (Tr. 892) and that due to pain he is able to focus for only five to twenty minutes at a time. (Tr. 894). Plaintiff reported he is unable to lift anything with his right shoulder and grasp items with his dominate left hand. (Tr. 894). Plaintiff testified that he needs to shift positions frequently when sitting and standing, and is unable to stoop, crouch, or crawl. (Tr. 895). Plaintiff testified that he is unable to lift more that eight pounds, only has four to five good days a month, and has difficulty concentrating due to depression. (Tr. 896).

## OPINION

Plaintiff assigns five errors in this case: (1) the ALJ erred in determining plaintiff's RFC; (2) the ALJ erred in not finding plaintiff disabled under SSR 96-9p; (3) the ALJ erred in not finding plaintiff disabled under SSR 96-8p with regard to sustainability of work and thus did not adequately explain his RFC finding; (4) the ALJ failed to consider plaintiff's pain; and (5) the ALJ erred in relying on VE testimony where no DOT (Dictionary of Occupational Title) codes were supplied. For the reasons that follow, the Court finds the ALJ's decision is supported by

20

substantial evidence and should be affirmed.

## I. The ALJ's RFC finding

Plaintiff's first three assignments of error challenge the ALJ's RFC finding and will be considered together. Plaintiff contends the ALJ erred in determining plaintiff's RFC by relying on the opinions of one-time and non-examining physicians to the exclusion of plaintiff's treating physicians who all opined that plaintiff was disabled. As outlined above, the RFC assessments of Drs. Kahn and Ezzeddine limited plaintiff to less than sedentary work activity due to his physical and mental impairments. Dr. Shubs opined that plaintiff's mental impairments imposed work-related limitations which would preclude sustained work activity. Plaintiff asserts that as treating physicians, these doctors were entitled to greater deference than those physicians upon whom the ALJ relied.

In terms of plaintiff's physical functional capacity, ALJ McNichols essentially adopted the July 13, 2004 RFC finding made by ALJ Shell in a previous hearing decision denying plaintiff SSI benefits, citing *Drummond v. Commissioner of Social Security*, 126 F.3d 837 (6th Cir. 1997). (Tr. 27-28). In *Drummond,* the Sixth Circuit held that an ALJ addressing a claimant's subsequent application is bound by the findings of a previous ALJ "[a]bsent evidence of an improvement in a claimant's condition." *Id.* at 842. ALJ Shell's July 2004 RFC was for a modified range of light work. ALJ McNichols adopted this RFC, but imposed additional limitations. (Tr. 27; *see* Tr. 65-79). ALJ McNichols noted there was little documented change in plaintiff's physical condition since his prior hearing at which an orthopedic medical expert testified. Plaintiff's cervical and lumbar spinal regions remained stable with solid surgical fusions and no neurological compromise. (Tr. 27). In addition, plaintiff's Hepatitis C was just

21

mildly active. (Tr. 27). The ALJ noted that while plaintiff had numerous emergency room visits
since his last hearing decision, his drug-seeking behavior accounted for many, if not all, of those
visits. (Tr. 27; *see also* Tr. 22 outlining emergency room visits). In addition, the ALJ noted that
the state agency consulting doctors reported physical limitations consistent with the modified
light RFC found in the previous decision. (Tr. 28; *see* Tr. 383-389).[1] ALJ McNichols then
imposed additional restrictions to account for the chronic nature of plaintiff's symptoms,
including a limitation of lifting 10 pounds frequently and 20 pounds occasionally to protect
against undue strain on plaintiff's spine and non-focal type of weakness caused by Hepatitis C.
(Tr. 28). The ALJ also added the limitation that plaintiff be permitted to alternate sitting and
standing at 30 minute intervals, postural limitations to avoid strain on his back and joints, and
certain environmental restrictions. (Tr. 28).

In determining plaintiff's physical RFC, the ALJ rejected the opinions of Drs. Kahn and
Ezzeddine. (Tr. 28-29). The ALJ gave no controlling weight and no substantial deference to Dr.
Khan's RFC, stating that Dr. Khan had little, if any, contact with plaintiff prior to his completion
of the RFC form. The ALJ also pointed to Dr. Khan's consideration of plaintiff's psychological
conditions which were outside of Dr. Khan's area of expertise, as well as the lack of detailed
medical findings to support Dr. Khan's assessment. In addition, the ALJ determined that Dr.
Khan's grim assessment was contrary to the weight of the medical evidence of record.

The ALJ's decision in this regard is supported by substantial evidence. Plaintiff relies not

---

[1]Plaintiff objects to the ALJ's reliance on the state agency form because the form was not signed by
Teresita Cruz, the state agency medical consultant on initial review of plaintiff's claim. (Doc. 5 at 10). However, as
the ALJ pointed out, on reconsideration the form was adopted and signed by Dr. Congbalay and was therefore
admitted by the ALJ as the report of the state agency physicians. (Tr. 17). The Court determines the ALJ did not err
in considering this evidence.

22

on Dr. Kahn's own examinations and treatment of plaintiff, but on the records of other physicians at the Butler County Health Center at which Dr. Kahn is a practicing physician. (Doc. 5 at 11). While it is not improper for a physician in a group setting to refer to and rely on reports and progress notes written by his or her colleagues in treating a patient, the lack of a personal examination of the patient is one factor the ALJ may consider in determining the weight to give that physician's opinion. After all, the treating physician rule is premised on the notion that a physician who has examined and treated a patient over time is in a better position to assess the severity of and limitations surrounding the patient's impairments. *Barker*, 40 F.3d at 794. The evidence here shows Dr. Khan examined plaintiff one time on March 2, 2007 prior to completing the RFC form on March 13, 2007. (Tr. 575). On that occasion, plaintiff came to the office to obtain a refill on his psoriasis medication. *Id*. Dr. Khan assessed psoriasis, Hepatitis C, and psychiatric problems. *Id*. There is no indication that Dr. Khan performed a physical examination or assessed any problems with plaintiff's back or abdomen. There is also no indication that plaintiff complained of back or abdominal pain on that visit. *Id*. On March 13, 2007, the date plaintiff came to the office to ask Dr. Khan to complete the RFC form, Dr. Khan's assessment was for "neck pain" only. (Tr. 629). Yet, the limitations imposed by Dr. Khan's RFC assessment are premised, in part, on plaintiff's back and abdominal pain–conditions Dr. Kahn made no mention of on the two occasions he saw plaintiff. (Tr. 624). In view of the limited contact Dr. Khan had with plaintiff, the ALJ was free to give the opinion less weight.

To the extent Dr. Khan may have relied on the progress notes of his colleagues, an examination of those records show little, if any, significant clinical or objective findings to substantiate the extreme limitations contained in Dr. Khan's RFC opinion. (Tr. 605-615, 579-

23

604). The records show that plaintiff was generally followed for refills on his medications. In addition, the objective x-ray, CT, and MRI findings do not support Dr. Khan's assessment. (Tr. 456, 459, 530, 550, 554, 555). The MRI findings cited by plaintiff in his brief (Doc. 5 at 12) show "mild" abnormal enhancing soft tissue within the neural foramen at the L4-L5 level that was impinging on the left L4 nerve root and was suspicious for scar tissue. (Tr. 832). This MRI was performed in January 2008 and could not have been the basis for Dr. Khan's March 2007 assessment. Nor do plaintiff's "subjective complaints of back, neck and abdominal pain" (Doc. 5 at 11) provide the "medically acceptable clinical and laboratory diagnostic techniques" necessary to accord Dr. Khan's opinion controlling weight. *Rogers v. Commissioner of Social Sec.*, 486 F.3d 234, 242 (6th Cir. 2007); *Wilson*, 378 F.3d at 544. The ALJ gave "good reasons" supported by the substantial evidence of record for rejecting Dr. Khan's RFC opinion. *Rogers*, 486 F.3d at 242. Therefore, the ALJ did not err in failing to defer to Dr. Khan's opinion.

The ALJ's rejection of Dr. Ezzeddine's RFC opinion is likewise substantially supported by the record. The ALJ stated that plaintiff saw Dr. Ezzeddine only three times in 2007, and only after Dr. Min, plaintiff's treating gastroenterologist "declined to espouse the claimant's claim of disability." (Tr. 29). The ALJ noted that Dr. Ezzeddine's opinion appeared to be based on plaintiff's subjective complaints, including his mental condition over which the record failed to show any expertise on the part of Dr. Ezzeddine. *Id*. Finally, the ALJ pointed out that Dr. Ezzeddine's treatment notes failed to support the excessive restrictions imposed. *Id*.

Plaintiff argues the ALJ erred by not according Dr. Ezzeddine greater weight because she is a "treating physician." (Doc. 5 at 12). The ALJ did not characterize Dr. Ezzeddine as a treating physician, but as a "medical source" who saw plaintiff only three times in 2007. (Tr. 29).

Because this finding is substantially supported by the record, Dr. Ezzeddine's RFC opinion was not entitled to any special deference. *See Barker*, 40 F.3d at 794. Dr. Ezzeddine's progress notes show she saw plaintiff on only two, not three, occasions. (Tr. 766-769).[2] The first visit on September 21, 2007, was prompted by Dr. Min's refusal to qualify plaintiff for disability. (Tr. 768). Dr. Ezzeddine stated, "He has come to me for a second opinion whether he is disabled or not. He does not want to be treated by me, however." (Tr. 767). Dr. Ezzeddine's physical examination on this date revealed completely normal findings. (Tr. 767-68). The progress note from the second visit on November 2, 2007, lists plaintiff's weight and blood pressure and the following notation: "Dr. Kirkpatrick at OSU wants to try [illegible]. Could not tolerate IF. Send a copy of disa (sic) to pt." (Tr. 766). There are no other notations or comments reflected in the progress note nor any notations showing Dr. Ezzeddine physically examined plaintiff on this date. On November 7, 2007, Dr. Ezzeddine completed an RFC form on behalf of plaintiff which essentially indicated an inability to perform even sedentary work on a full-time basis. (Tr. 714-718). Yet, none of the records from Dr. Ezzeddine reflect any clinical, let alone objective, findings to support her extreme limitations. Indeed, from the complete lack of any pertinent findings based on her examination of plaintiff, the ALJ reasonably concluded that Dr. Ezzeddine

---

[2] A treating physician is defined as a physician "who provides you, or has provided you, with medical treatment or evaluation *and* who has, or has had, an *ongoing* treatment relationship with you." 20 C.F.R. § 416.902 (emphasis added). Generally, an ongoing treatment relationship exists "when the medical evidence establishes that you see, or have seen, the source with a frequency consistent with accepted medical practice for the type of treatment and/or evaluation required." *Id.* Social Security "will not consider an acceptable medical source to be your treating source if your relationship with the source is not based on your medical need for treatment or evaluation, *but solely on your need to obtain a report in support of your claim for disability*." 20 C.F.R. § 416.902 (emphasis added). The two visits to Dr. Ezzeddine do not constitute ongoing treatment of plaintiff, particularly where plaintiff was seeking a "second opinion" for purposes of his disability claim when Dr. Min refused to give him one.

relied on plaintiff's subjective complaints in crafting her RFC. The ALJ's reasons for rejecting Dr. Ezzeddine's assessment of plaintiff's abilities is substantially supported by the record.

Plaintiff also contends the ALJ erred in misapplying Social Security Ruling 96-9p, which according to plaintiff provides that "a complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply." (Doc. 5 at 13). Plaintiff argues that since Dr. Khan opined that plaintiff should "never" stoop (Tr. 628) and Dr. Ezzeddine opined that plaintiff should "rarely" stoop (Tr. 717), SSR 96-9p directs a finding that plaintiff is disabled.

Plaintiff's argument rests on the premise that Dr. Khan's and Dr. Ezzeddine's RFC assessments should have been accorded deference by the ALJ. But, as explained above, the ALJ's decision declining to defer to these assessments is substantially supported by the record. In addition, and contrary to plaintiff's argument, Social Security Ruling 96-9p, when taken in context, does not *ipso facto* direct a finding of disability under the circumstances:

> An ability to stoop occasionally; i.e., from very little up to one-third of the time, is required in most unskilled sedentary occupations. A complete inability to stoop would significantly erode the unskilled sedentary occupational base and a finding that the individual is disabled would usually apply, but restriction to occasional stooping should, by itself, only minimally erode the unskilled occupational base of sedentary work. *Consultation with a vocational resource may be particularly useful for cases where the individual is limited to less than occasional stooping.*

(Social Security Ruling 96-9p)(emphasis added). The ALJ consulted with a vocational expert in this case for the vocational implications of the limitation that plaintiff perform no repetitive stooping. As this was specifically provided for in the Ruling, the ALJ did not err in his application of Social Security Ruling 96-9p in the instant case.

Nor does the Court agree with plaintiff's argument that the ALJ failed to adequately

explain his RFC decision in accordance with Social Security Ruling 96-8p. This ruling requires the ALJ to show that plaintiff retains the RFC for sustained work activities "on a regular and continuing basis," meaning eight hours per day, five days per week. To the extent plaintiff relies on the RFC decisions of Drs. Khan and Ezzeddine for the conclusion that plaintiff is unable to perform work activities on a regular and continuing basis, for the reasons discussed above the ALJ did not err in failing to adopt their assessments. Plaintiff also argues that his testimony showed he needed to shift positions frequently when sitting and standing and was most comfortable when lying down, all of which would significantly erode the occupational base for unskilled sedentary work. (Doc. 5 at 15-16). This argument is premised on a finding that the limitations to which plaintiff testified were credible. However, as will be explained below, the ALJ's finding that plaintiff's complaints and limitations were not credible is supported by substantial evidence. Therefore, this argument is without merit and does not provide a basis for reversal of the ALJ's decision.

Plaintiff also contends the ALJ erred in failing to give proper weight to the opinion of Dr. Shubs, plaintiff's treating psychiatrist, and instead gave greater weight to the opinions of Dr. Dreyer, the consultative psychologist, and the non-examining state agency psychologists. (Doc. 5 at 10). Plaintiff contends the ALJ erroneously placed "great weight" on the state agency non-examining psychologists and adopted the opinion of Dr. Dreyer without addressing key findings by Dr. Dreyer which contradicted the ALJ's mental RFC finding. (Doc. 5 at 10).

Contrary to plaintiff's argument, the ALJ did not place "great weight" on the opinions of the state agency psychologists who determined plaintiff did not have a severe mental impairment. In fact, the ALJ rejected those conclusions. (Tr. 26).

27

Plaintiff is also incorrect that the ALJ failed to consider Dr. Dreyer's findings that plaintiff was likely to work at a much slower pace, that plaintiff had poor coping skills and a low frustration tolerance, and that plaintiff would need a payee if granted benefits. (Doc. 5 at 10). The ALJ determined that the evidence of plaintiff's mood disturbance and anxiety, as well as his low stress tolerance, should be accommodated by limiting plaintiff to a low stress job without production quotas. (Tr. 28). The ALJ also limited plaintiff to work requiring little, if any, concentration given plaintiff's preoccupation with disability issues and his distractibility. *Id*. The ALJ also restricted plaintiff from work involving complex or detailed instructions. *Id*. Dr. Dreyer's opinion is not to the contrary.

Dr. Dreyer opined that plaintiff's ability to understand, remember, and follow simple instructions was only mildly impaired. (Tr. 379). Dr. Dreyer also opined that even though plaintiff was likely to work at a much slower place, his mental ability to maintain attention, concentration, persistence, and pace to perform simple repetitive tasks was only mildly to moderately impaired, and not altogether precluded. (Tr. 378-79). Also, despite plaintiff's poor coping skills and a low frustration tolerance, Dr. Dreyer nevertheless opined that plaintiff's mental ability to withstand the stress and pressures associated with day-to-day work activities was only mildly to moderately impaired. (Tr. 380). Finally, the only reason Dr. Dreyer recommended a payee if plaintiff were granted benefits was due to his past polysubstance abuse issues, and not due to any inability to manage funds from a mental standpoint. (Tr. 380).

The ALJ's rejection of Dr. Shubs's opinion of disability is also supported by substantial evidence. The ALJ determined that Dr. Shubs failed to provide detailed clinical findings in his progress notes or a longitudinal history to support his pessimistic conclusions on plaintiff's

28

inability to work. The ALJ pointed out that the majority of the mental status examinations contained in the progress notes were unremarkable. The ALJ cited to the infrequent nature of Dr. Shubs's examinations (once every three months for one-half hour) and noted that such visits were primarily to monitor plaintiff's medications. (Tr. 26). The ALJ also considered Dr. Shubs's assessment that plaintiff's medication and supportive therapy were effective in controlling his symptoms "so long as he is not under stress." (Tr. 26). The ALJ also believed that Dr. Shubs's reliance on plaintiff's orthopedic problems was outside of his area of expertise. *Id*. Finally, the ALJ stated that Dr. Shubs's implied conclusion that plaintiff lacked sufficient stress tolerance for any work was inconsistent with the other evidence of plaintiff's capacity to carry out daily activities and to interact with others. (Tr. 26).

Plaintiff contends that Dr. Shubs "has seen Plaintiff since 2004 and obviously had a greater opportunity to examine and observe the Plaintiff and is more familiar with his condition than non-examining physicians" and that his assessments are "based on his examinations and observations of the Plaintiff over time for many years." (Doc. 5 at 10-11). Plaintiff also argues that the ALJ should have contacted Dr. Shubs for clarification or an explanation if he felt his assessment of plaintiff's functioning was inconsistent with his treatment notes. *Id*.

The ALJ gave specific reasons, based on the evidence of record, for discounting Dr. Shubs's opinion. Plaintiff has made no attempt to address the specific reasons cited by the ALJ and instead relies on Dr. Shubs's longevity of treatment of plaintiff as the basis for reversal. Plaintiff has pointed to no specific clinical or progress notes over the many years of treatment showing the "observations" upon which Dr. Shubs relies for his conclusions. Nor did the ALJ err in not recontacting Dr. Shubs for clarification because there was sufficient evidence in the

record to make a determination on plaintiff's claim for disability. *See* 20 C.F.R. § 416.912(e). "The duty to recontact is 'triggered when the evidence is insufficient to make an *informed* determination, not when the evidence is insufficient to make a *favorable* determination.'" *Daniels v. Astrue*, No. 09-21-GFVT, 2010 WL 599634, at \*2 (E.D. Ky. Feb. 17, 2010) (quoting *Pearson v. Barnhart*, 2005 WL 1397049, at \*4 (E.D. Tex. May 23, 2005) (emphasis in original)). *See also Johnson v. Commissioner of Social Security*, 529 F.3d 198, 205 (3rd Cir. 2008); *Thomas v. Barnhart*, 278 F.3d 947, 958 (9th Cir. 2002); *DeBoard v. Comm'r of Social Security*, 211 Fed. Appx. 411, 416 (6th Cir. 2006). Here, the ALJ did not find that Dr. Shubs's report was inadequate to make a determination as to plaintiff's disability. Rather, he determined that Dr. Shubs's report was not supported by his own clinical notes or the other substantial evidence of record. Thus, the ALJ did not err in failing to contact Dr. Shubs for clarification of his opinion on plaintiff's ability to work. The Court finds assignments of error one, two and three to be without merit.

## II. Pain

Plaintiff's fourth assignment of error asserts the ALJ erred by failing to properly credit plaintiff's complaints of pain. Plaintiff points to his years of treatment for chronic back pain at the Middletown Regional Hospital and cites to the notes recording his complaints of pain and diagnoses of chronic back pain. (Doc. 5 at 17). Plaintiff also cites to CT scans and x-rays showing degenerative changes at L5-S1 (Tr. 456, 459) and his testimony that constant pain interferes with his ability to concentrate.

There is no dispute that plaintiff suffers from chronic low back pain from his medically determinable impairments as the ALJ acknowledged. (Tr. 29). However, plaintiff fails to point

30

to specific record evidence showing objective medical evidence to confirms the severity of the pain he alleges or that his objectively established medical conditions can reasonably be expected to produce his allegedly disabling pain. *Duncan,* 801 F.2d at 853. Plaintiff points to his own subjective testimony as evidence confirming the extent of his alleged limitations and pain. (Doc. 5 at 18). Such subjective evidence does not satisfy the *Duncan* test and cannot alone support a finding of disability. *Duncan,* 801 F.2d at 852-53; 20 C.F.R. § 404.1529. *See also McCormick v. Secretary,* 861 F.2d 998, 1001 (6th Cir. 1988). The ALJ noted that the objective tests showed a solid fusion of the spine and stable physical conditions and that plaintiff has not required major surgery since 2003. (Tr. 29). The ALJ reasonably found that plaintiff's numerous emergency room visits were accompanied by drug-seeking behavior as well as behavior that was inconsistent with his subjective complaints. *Id.* The ALJ also noted that plaintiff's hepatitis appeared to be mild and at the hearing plaintiff gave the impression of exaggerating his symptoms. *Id.* The ALJ's decision adequately sets forth the reasons for his credibility finding and shows he considered the required factors in determining plaintiffs credibility. *See* 20 C.F.R. § 416.929(c). In light of the ALJ's opportunity to observe plaintiff's demeanor, the ALJ's credibility finding is entitled to deference and should not be discarded lightly. *Kirk,* 667 F.2d at 538. *See also Cruse v. Commissioner,* 502 F.3d 532, 542 (6th Cir. 2007); *Walters v. Commissioner,* 127 F.3d 525, 531 (6th Cir. 1997); *Gaffney v. Bowen,* 825 F.2d 98, 101 (6th Cir.1987). Accordingly, the Court finds substantial evidence supports the ALJ's credibility finding in this matter. Plaintiff's fourth assignment of error is without merit.

## III. Vocational Testimony

Plaintiff contends the ALJ erred by relying on vocational testimony where no Dictionary

of Occupation Title codes were provided by the VE. Plaintiff argues that without the DOT

codes, it is impossible to ascertain whether a conflict exists between the DOT and jobs provided

by the VE. Plaintiff states that reliance on vocational testimony in the absence of DOT codes is

reversible error under Social Security Ruling 00-4p.

> Social Security Ruling 00-4p provides, in relevant part:

> Occupational evidence provided by a VE or VS generally should be consistent
> with the occupational information supplied by the DOT. When there is an
> apparent unresolved conflict between VE or VS evidence and the DOT, the
> adjudicator must elicit a reasonable explanation for the conflict before relying on
> the VE or VS evidence to support a determination or decision about whether the
> claimant is disabled. At the hearings level, as part of the adjudicator's duty to
> fully develop the record, the adjudicator will inquire, on the record, as to whether
> or not there is such consistency.

> Neither the DOT nor the VE or VS evidence automatically 'trumps' when there is
> a conflict. The adjudicator must resolve the conflict by determining if the
> explanation given by the VE or VS is reasonable and provides a basis for relying
> on the VE or VS testimony rather than on the DOT information.

SSR 00-4p.

In this case, the ALJ, in accordance with his duties under SSR 00-4p, asked the VE to

identify any evidentiary conflicts between the jobs listed and the DOT. (Tr. 904). In response,

the VE testified, "The only evidentiary conflict is the issue of sit/stand, and for that I used the

published research and observation." *Id.* The ALJ then turned the questioning over to plaintiff's

attorney, the same counsel who represents plaintiff in the instant appeal. *Id.* Plaintiff's attorney

did not ask the VE to provide the DOT numbers for the jobs the VE identified as appropriate for

plaintiff (Tr. 905-911) and cannot now complain that no DOT numbers were supplied. The cases

cited by plaintiff in his brief are inapposite. In those cases, unlike the instant case, the ALJ failed

to question the VE regarding whether the jobs identified conflicted with the DOT. *See, e.g.,*

32

*Teverbaugh v. Commissioner*, 258 F. Supp.2d 702, 705 (E.D. Mich. 2003). In addition, as the Sixth Circuit recently determined, the ALJ is under no obligation to further interrogate a VE further once the VE testifies there is no conflict with the DOT, especially where the plaintiff is afforded a full opportunity to cross-examine the VE. *See Lindsley v. Commissioner*, 560 F.3d 601, 606 (6th Cir. 2009). Plaintiff's fifth assignment of error should be overruled.

## IT IS THEREFORE RECOMMENDED THAT:

The decision of the Commissioner be **AFFIRMED** and this matter be closed on the docket of the Court.

Date: __3/1/10__

Timothy S. Hogan
United States Magistrate Judge

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF OHIO
## WESTERN DIVISION

JOHN HOLLAND,
    Plaintiff

Case No. 1:09-cv-240
Weber, J.
Hogan, M.J.

  vs

COMMISSIONER OF
SOCIAL SECURITY,
    Defendant

### NOTICE TO PARTIES REGARDING FILING OF OBJECTIONS TO R&R

Pursuant to Fed. R. Civ. P. 72(b), any party may serve and file specific, written objections to the proposed findings and recommendations within fourteen (14) days after being served with this Report and Recommendation. Pursuant to Fed. R. Civ. P. 6(e), this period is automatically extended to thirteen (13) days (excluding intervening Saturdays, Sundays, and legal holidays) because this Report is being served by mail, and may be extended further by the Court on timely motion for an extension. Such objections shall specify the portions of the Report objected to and shall be accompanied by a memorandum of law in support of the objections. If the Report and Recommendation are based in whole or in part upon matters occurring on the record at an oral hearing, the objecting party shall promptly arrange for the transcription of the record, or such portions of it as all parties may agree upon, or the Magistrate Judge deems sufficient, unless the assigned District Judge otherwise directs. A party may respond to another party's objections within fourteen (14) days after being served with a copy thereof. Failure to make objections in accordance with this procedure may forfeit rights on appeal. *See United States v. Walters,* 638 F.2d 947 (6th Cir. 1981); *Thomas v. Arn*, 474 U.S. 140 (1985).